*Local Rule 81*

*Local Rules of Civil Procedure of the Western District of New York*

**Index of Documents Filed or Served in the
New York State Court Action**

| Exhibit | Document | Date Filed and/or Served |
|---------|----------|--------------------------|
| **A** | Summons & Verified Complaint | September 6, 2021 (filed)<br>October 29, 2021 (received: Todd Baxter) |

# EXHIBIT A

MONROE COUNTY CLERK'S OFFICE                    THIS IS NOT A BILL. THIS IS YOUR RECEIPT.

Receipt # 2832706

Book    Page    CIVIL

Return To:                                      No. Pages: 25
ELLIOT DOLBY-SHIELDS
192 Lexington Avenue, Suite 802                 Instrument: EFILING INDEX NUMBER
New York, NY 10016

Control #:        202109070518
Index #:          E2021008256

Date: 09/07/2021

GRAYSON, TIARA                                  Time: 12:38:28 PM

The City of Rochester
Williams, Marlon
Vandemar, Nicholas
Baxter, Todd

| | | |
|---|---|---|
| State Fee Index Number | $165.00 | |
| County Fee Index Number | $26.00 | |
| State Fee Cultural Education | $14.25 | |
| State Fee Records | $4.75 | Employee: CW |
| Management | | |
| | | |
| Total Fees Paid: | $210.00 | |

State of New York

MONROE COUNTY CLERK'S OFFICE
WARNING – THIS SHEET CONSTITUTES THE CLERKS
ENDORSEMENT, REQUIRED BY SECTION 317-a(5) &
SECTION 319 OF THE REAL PROPERTY LAW OF THE
STATE OF NEW YORK. DO NOT DETACH OR REMOVE.

JAMIE ROMEO

MONROE COUNTY CLERK



**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

TIARA GRAYSON,

                                              Plaintiff,          **SUMMONS**

                    -against-                                     Index No.:

THE CITY OF ROCHESTER, a municipal entity,      The basis of venue is:
MARLON WILLIAMS, NICHOLAS VANDEMAR,      Location of the incident
"JOHN DOE POLICE OFFICERS 1-200" (names and
number of whom are unknown at present), TODD BAXTER,      Plaintiff designates Monroe
"RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names      County as the place of trial.
and number of whom are unknown at present), and other
unidentified members of the Rochester Police Department
and Monroe County Sheriff's Office,

                                              Defendants.

**To the above named Defendants:**

**You are hereby summoned** to answer the complaint in this action, and to serve a copy of your
answer, or, if the complaint is not served with this summons, to serve a notice of appearance on
the Plaintiff's attorneys within twenty days after the service of this summons, exclusive of the day
of service, where service is made by delivery upon you personally within the state, or, within 30
days after completion of service where service is made in any other manner. In case of your failure
to appear or answer, judgment will be taken against you by default for the relief demanded in the
complaint.

DATED: New York, New York
            September 6 2021

                                              Yours, etc.,

                                              ROTH & ROTH, LLP.
                                              ELLIOT SHIELDS, ESQ.
                                              Attorney for Plaintiff
                                              192 Lexington Ave, Suite 802
                                              New York, New York 10016
                                              (212) 245-1020

                                              EASTON THOMPSON
                                              KASPEREK SHIFFRIN LLP
                                              Donald Thompson
                                              16 West Main Street, Suite 243
                                              Rochester, New York 14614
                                              Ph: (585) 423-8290

TO:

CITY OF ROCHESTER
CORPORATION COUNSEL
30 Church Street
Rochester, New York 14614

COUNTY OF MONROE
Monroe County Law Department
307 County Office Building
39 W. Main St.
Rochester, NY 14614

MARLON WILLIAMS and NICHOLAS VANDEMAR
185 Exchange Blvd.
Rochester, New York 14614

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF MONROE**

TIARA GRAYSON,

Plaintiff,

-against-

THE CITY OF ROCHESTER, a municipal entity, MARLON WILLIAMS, NICHOLAS VANDEMAR, "JOHN DOE POLICE OFFICERS 1-200" (names and number of whom are unknown at present), TODD BAXTER, "RICHARD ROE SHERIFF'S DEPUTIES 1-200" (names and number of whom are unknown at present), and other unidentified members of the Rochester Police Department and Monroe County Sheriff's Office,

Defendants.

INDEX NO.:

**VERIFIED COMPLAINT**
**[JURY TRIAL DEMANDED]**

Plaintiff, by his attorneys, ROTH & ROTH, LLP and EASTON THOMPSON KASPAREK SHIFFRIN LLP, complaining of the defendants, respectfully allege as follows:

## I.   **PARTIES**

1.      Plaintiff TIARA GRAYSON (she/her) is a resident of the City of Rochester, State of New York.

2.      Defendant CITY OF ROCHESTER ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department, which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the RPD.

3.      Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized police department,

authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

4.   MARLON WILLIAMS ("WILLIAMS"), NICHOLAS VANDEMAR ("VANDEMAR") and "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment with the CITY and RPD and under color of state law. They are sued in their individual capacities. John Doe RPD Officers are referred to collectively as "the RPD officers."

5.   Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

6.   "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the Monroe County Sheriff's Office ("MCSO"). At all relevant times, these defendants were acting within the scope of their employment with the County and under Sheriff BAXTER and acting under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

7.   BAXTER is responsible for the training, supervision and discipline of the Defendant Sheriff's Deputies under state law.

## III.  JURISDICTION

8.      This action falls within one or more of the exceptions as set forth in CPLR

Section 1602, involving intentional actions, as well as the defendant, and/or defendants, having

acted in reckless disregard for the safety of others, as well as having performed intentional acts.

9.      Plaintiff sustained damages in an amount in excess of the jurisdictional limits of

all the lower Courts of the State of New York.

10.     Plaintiff filed a timely Notice of Claim against the City and County of Monroe, in

compliance with the Municipal Law § 50.

11.     The CITY and County waived a 50-h hearing for Plaintiff.

12.     More than thirty (30) days have elapsed since service of said Notice of Claim was

filed and the City and County have failed to pay or adjust the claim.

13.     This action is being brought within a year and 90 days of the event that gives rise

to Plaintiff's causes of action under New York State law and Plaintiff has complied with all of

the statutory prerequisites for bringing this action.

## IV.  STATEMENT OF FACTS

### A.  August 28, 2020 Arrest.

14.     On August 28, 2020, at approximately 4:00 p.m., in the vicinity of 19 Edgeland

Street, Rochester, NY, Plaintiff was falsely arrested, assaulted and battered by WILLIAMS and

VANDEMAR.

15.     Plaintiff's mother had called 911 for help for Plaintiff because she had been

threatened with physical violence by a neighbor.

16.     WILLIAMS and VANDEMAR approached Plaintiff to investigate the alleged

dispute with a neighbor.

17.     Without warning, cause or justification, WILLIAMS and VANDEMAR immediately physically seized Plaintiff.

18.     When Plaintiff asked why she was being detained, WILLIAMS and VANDEMAR refused to tell her.

19.     When Plaintiff insisted that WILLIAMS and VANDEMAR tell her why she was being detained, they retaliated by slamming her on the ground, without cause or justification.

20.     When WILLIAMS and VANDEMAR slammed her to the ground, Plaintiff's knees forcefully hit the ground, causing serious injuries to her right knee.

**B. Facts Common to All Claims Arising From September 2020 Protests.**

21.     On March 23, 2020, Daniel Prude's family sought help from the Rochester Police Department ("RPD") as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30.

22.     When the video of RPD Officers killing Daniel Prude was finally made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the CITY finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives.

23.     On September 2-6, 2020, the defendants responded to peaceful protests with extreme violence—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions.

24.     On September 4, RPD officers and Sheriff's Deputies used the Court Street bridge to "kettle" protesters, spray them with tear gas, and attack them with pepper balls—a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama. Videos from that night show heavily armored phalanxes of police using pepper balls, 40mm kinetic bullets, tear gas, and batons to assault diverse groups of protesters outfitted only with umbrellas, cardboard boxes, and plastic children's sleds against the Defendants' military-grade arsenal but who nevertheless assembled to protest for racial justice and reformed policing.

25.     RPD officers first escorted peaceful protesters along Court Street from Martin Luther King Jr. Memorial Park towards the Public Safety Building ("PSB") and directed them onto the Court Street Bridge. But when protesters reached the other side, law enforcement stopped them with metal barricades.

26.     After hundreds of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." However, the dispersal orders were not clearly communicated, and the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders. Moreover, there was nowhere for the protesters in the front near the police barricades to go.

27.     Suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law enforcement officers began violently attacking protesters. In fact, the RPD Officers began indiscriminately firing pepper balls into the crowd less than 30 seconds after the first "dispersal" order was issued at approximately 10:43 p.m

28.     Plaintiff was present on the bridge and it was physically impossible for her to immediately comply and disperse from the bridge.

29.     Plaintiff was shot multiple times in the right knee with pepper balls, without cause or justification.

30.     Plaintiff was also subjected to large amounts of chemical weapons from tear gas, pepper spray and pepper balls.

31.     Thereafter, on September 5 at approximately 12:00 a.m. to 1:00 a.m., on Court Street in the vicinity of the Court Street Parking Garage, RPD officers and/or Sheriff's Deputies subjected Plaintiff to large amounts of tear gas and other chemical weapons.

32.     As a result of the chemical weapons Defendants used against her on September 4-5, 2020, Plaintiff sustained irritation to her skin, eyes, mouth, nose and lungs and menstrual irregularities.

33.     As a result of Defendants shooting her with pepper balls, her injuries from August 28, 2020 were exacerbated.

C.     **Negligence of the City And RPD in Failing to Properly Train RPD Officers On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Officers Who Used Excessive Force Against Protesters.**

34.     The violation of Plaintiff's rights is attributable to the CITY and RPD's disregard of many years of notice, criticism, and other relevant data points, both internal and external, related to its unconstitutional policing of similar protests.

35.     Since at least the 2009, the RPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, including peaceful protests and lawful demonstrations.

36.     Upon information and belief, the core training provided by the CITY related to protest response is based on crowd management and disorder control tactics for policing large-scale civil disorders and riots.

37.     According to the CITY's website, the RPD's Mobile Field Force (MFF) is a "specially trained and equipped team providing a rapid, organized and disciplined response to civil disorder [and] crowd control."

38.     The MFF was the RPD's primary unit tasked with policing the peaceful protests in the wake of George Floyd and Daniel Prude in May and September 2020.

39.     Upon information and belief, the MFF's training and guidelines treat peaceful protests and peaceful demonstrations  as military engagements and copies military tactics and focus on tactics designed to deter, disperse, and demoralize groups, such as disorder control formations and mass use of chemical weapons.

40.     Such disperse and demoralize tactics have persisted through the present as exemplified by the experiences of Plaintiff.

41.     Upon information and belief, the MFF's "civil disorder" training and guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations—only for large-scale civil disorders such as riots.

42.     However, neither the MFF's "civil disorder" training and guidelines, nor, upon information and belief, any related RPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

43.     For example, upon information and belief, there is virtually no RPD training—and certainly no meaningful RPD training—focusing on how to utilize the tactics described in

the MFF's "civil disorder" training and guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

44.     Many MFF members have histories of engaging in the kinds of misconduct complained of herein, among other places, by CRB complaints, PSS investigations and in lawsuits.

45.     Examples of the RPD's unreasonable and discriminatory use of force at prior lawful protests include

- In October 2009, an anti-war protest in Rochester resulted in several physical confrontations, with two protesters receiving stitches at the hospital after RPD officers pushed them face-first to the ground, and 12 protesters arrested for exercising their First Amendment rights. The peaceful march, held in the early evening, was interrupted by approximately forty RPD vehicles. Within three minutes of giving the order to disperse, RPD officers began to shove and hit protesters with clubs and deploy pepper spray. Protesters described RPD officers wading through the crowd to pick out Black students to arrest. A press videographer who was filming one such arrest was wrestled to the ground by police and himself arrested.

- In May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren reside. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police brutality is a deeply personal

issue to Ms. Perkins, as her daughter Lashedica was the 13-year-old shot three times by former-Deputy Chief Simmons in 2005.

- In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response, the RPD deployed, beat, shoved, and pepper sprayed protesters. As one described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures." RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists: Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Over the course of one weekend, Rochester had more arrests at its BLM protest (74) than the rest of the nation combined.

46.   Despite the wealth of evidence of RPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in RPD training as it relates to constitutionally compliant protest policing.

47.   In fact, following the 2016 protest, the RPD and Mayor Lovely Warren's office stated the police handled themselves appropriately.

48.   When questioned by public officials after the September 2020 protests, former RPD Chief La'Ron Singletary stated that he did not review the RPD's actions at the 2016 protest in developing the RPD's strategy for responding to protests in 2020.

49.     In summary, upon information and belief, the RPD's exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that RPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates the City's negligence in failing to train and supervise RPD Officers in properly and lawfully policing protests to ensure that protesters' rights under the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights are not violated. As a result of the City's negligence, Plaintiff was injured and harmed, as described herein.

D.  **Negligence of Sheriff BAXTER in Failing to Properly Train Sheriff's Deputies On The Proper Handling of First Amendment Assemblies, and In Failing to Supervise and Discipline Sheriff's Deputies Who Used Excessive Force Against Protesters**.

50.     Similarly, prior to 2020, BAXTER had received clear notice that peaceful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

51.     Similarly, prior to September 2020, BAXTER had received clear notice that peaceful protests and lawful demonstrations have occurred and will continue to occur in Monroe County, and that without proper training, his Deputy Sheriffs would violate individuals' constitutional rights and endanger the life and safety of protesters, such as Plaintiff.

52.     BAXTER has deliberately disregarded the fact that peaceful protests and peaceful demonstrations have occurred and will continue to occur in Monroe County, and instead has trained his Deputies that such lawful First Amendment activities constitute "civil disturbances" that mut be policed in the same manner as "violent mobs" or "riots."

53.     BAXTER, upon information and belief, took no steps to train his Sheriff's Deputies on lawfully policing protests and other First Amendment activities.

54.     Instead, BAXTER, pursuant to the County's Hazard Mitigation Plan, trains his Sheriff's Deputies that a "civil disturbance" is defined as both "peaceful demonstrations or acts of violence."

55.     Upon information and belief, the Hazard Mitigation Plan was in full force and effect at all times relevant herein.

56.     Upon information and belief, prior to 2020 and at all times relevant herein, BAXTER had implemented the Hazard Mitigation Plan, and trained his Sheriff's Deputies in accordance with its mandates. Thus, BAXTER explicitly conflates peaceful protests and peaceful demonstration with violent riots.

57.     Upon information and belief, BAXTER did not provide any training to Sheriff's Deputies on drawing a meaningful distinction between "peaceful demonstrations" and "violent mobs". For example, in its "Hazard Mitigation Plan," the County states that, "Many civil unrest incidents are spontaneous and can occur at any time, rendering prediction of probability of future occurrences difficult. When these incidents occur, they can become extremely disruptive and difficult to control. Assumedly, civil unrest incidents including marches, protests, demonstrations, and gatherings will continue to occur throughout Monroe County."

58.     According to the Hazard Mitigation Plan, peaceful protests and demonstrations are discouraged because of the perceived negative impacts on property resources, real estate and the economy; again, this is a result of BAXTER falsely conflating "peaceful demonstrations" and peaceful protests with "acts of violence."

59.    Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on how to encourage and support individuals engaging in "peaceful demonstrations" to ensure that their constitutional rights are not violated by law enforcement officers.

60.    Upon information and belief, BAXTER does not provide any training to Sheriff's Deputies on making a meaningful distinction between how Sheriff's Deputies are trained and instructed on policing "peaceful demonstrations", "peaceful protests" versus "violent mobs" and riots.

61.    Instead, the Hazard Mitigation Plan states that, "[m]any protests intended to be peaceful demonstrations to the public and the government can escalate into general chaos." Thus, upon information and belief, BAXTER trains his Sheriff's Deputies to police peaceful demonstrations in the same manner as they would a violent mob.

62.    Like the RPD, upon information and belief, BAXTER trains Sheriff's Deputies exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations.

63.    In June 2020, several Monroe County Legislators called on BAXTER to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations. The legislators drafted a letter to County Executive Adam Bello and BAXTER in which they made a number of requests related to public safety and the safety of protesters, and closed by stating, "Once again, we believe the safety of both protesters, motorists, and law enforcement is of the utmost importance. Right here in Monroe County and across the Nation, we have seen the negative results when leaders are reactionary rather than proactive. Please be sure that a plan is in place to ensure the mutual safety of all involved."

64.    BAXTER claimed the letter was a "political stunt" and refused to provide any specific details regarding how Sheriff's Deputies would ensure the safety of protesters during peaceful demonstrations

65.    As a result of the BAXTER's negligence, Plaintiff was injured and harmed, as described herein.

## V.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### Municipal Liability

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's First, Fourth and Fourteenth Amendment Rights*

66.    All preceding and subsequent paragraphs are incorporated by reference.

67.    All of the wrongful acts or omissions complained of herein against Plaintiff and other protesters were carried out by the individually named and unnamed RPD officers pursuant to: (a) formal policies, rules, and procedures of Defendant CITY; (b) actions and decisions by Defendant CITY's policymaking agents; (c) customs, practices, and usage of the RPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by CITY policymaking officials; (d) Defendant CITY's deliberate indifference to Plaintiffs' rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the CITY's failures, and the failures of the other policymaking agents, to train, supervise, and discipline RPD officers, despite full knowledge of the their wrongful acts against Plaintiff and other protesters, as described herein.

68.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### SECOND CLAIM FOR RELIEF
### Excessive Force
*Pursuant to 42 U.S.C. § 1983*

69.    All preceding and subsequent paragraphs are incorporated by reference.

70.     Defendants' actions towards Plaintiff constitutes excessive force in violation of 4th and 14th Amendments of the United States Constitution and 42 U.S.C. § 1983.

71.     Defendants used force against Plaintiff that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted them.

72.     It was objectively unreasonable for the WILLIAMS and VANDEMAR to forcefully slam Plaintiff to the ground on August 28, 2020.

73.     It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to shoot Plaintiff with  pepper balls when on September 4-5, 2020.

74.     It was objectively unreasonable for the RPD Officers and/or Sheriff's Deputies to use other chemical weapons against Plaintiff, including tear gas, on September 4-5, 2020.

75.     The force used against Plaintiff—including shooting her with pepper balls and exposing her to tear gas—on September 4-5, 2020, constitutes a seizure under the 4th Amendment.

76.     The types and levels of force Defendants used against Plaintiff were in contravention of, or inconsistent with, related RPD policies and/or training.

77.     As a result of the acts and omissions of the RPD officers, Defendants deprived Plaintiff of federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

78.     The actions of the RPD Officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

79.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### THIRD CLAIM FOR RELIEF
**Assault and Battery**
*Pursuant to New York State Law*

80.     All preceding and subsequent paragraphs are incorporated by reference.

81.     WILLIAMS and VANDEMAR assaulted and battered Plaintiff by forcefully seizing her and slamming her on the pavement on August 28, 2020.

82.     RPD officers and/or Sheriff's Deputies battered Plaintiff by subjecting her to various chemical weapons and shooting her with pepper balls on September 4-5, 2020.

83.     Plaintiff was not threatening the law enforcement officers or any other person at any time.

84.     Plaintiff was not committing any crime or violation.

85.     By the aforedescribed conduct, Defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff without her consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

86.     The RPD Officers were at all times agents, servants, and employees acting within the scope of their employment by the Defendant CITY and the RPD, which are therefore responsible for their conduct.

87.     The Defendant CITY, as the employer of the individual RPD Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

88.     At no point during the incidents described herein did the circumstances necessitate or support the above applications of force utilized by the Defendant RPD officers against Plaintiff.

89.     The actions of the RPD Officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

90.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### FOURTH CLAIM FOR RELIEF
**First Amendment Infringements, Including First Amendment Retaliation**
***Pursuant to 42 U.S.C. § 1983***

91.     All preceding and subsequent paragraphs are incorporated by reference.

92.     In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiff of the rights protected by the First Amendment to the United States Constitution.

93.     Defendants (a) retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment, and (b) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to subjecting Plaintiff to excessive force, in arresting and prosecuting plaintiff, in selectively enforcing laws and regulations against Plaintiff, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

94.     Defendants engaged in those and other acts and omissions complained of herein in retaliation for Plaintiff's protected speech and/or conduct.

95.     Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech and/or conduct.

96.     Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct in the future.

97.     The actions of the RPD Officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

98.     As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**FIFTH CLAIM FOR RELIEF**
**Failure To Intervene**
***Pursuant to 42 U.S.C. § 1983***

99.     All preceding and subsequent paragraphs are incorporated by reference.

100.    The individual defendants all had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of her constitutional rights by the other Defendant RPD officers.

101.    The individual defendants failed to intervene on Plaintiff's behalf despite having had realistic opportunities to do so.

102.    The individual defendants failed to intervene on Plaintiff's behalf despite having substantially contributed to the circumstances within which Plaintiff's rights were violated by their affirmative conduct.

103.    As a result of the aforementioned conduct of the individual defendants, Plaintiff's constitutional rights were violated.

104.    The actions of the RPD Officers and/or Sheriff's Deputies were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

105.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

## SIXTH CLAIM FOR RELIEF
### Negligence
### (Against the CITY)

106.    All preceding and subsequent paragraphs are incorporated by reference.

107.    Defendant CITY was negligent in the training, supervision and discipline of the Defendant RPD officers, who were provided, upon information and belief, no training for policing protests, engaging in peaceful crowd control, or how to properly and safely use the "less lethal" weapons, including use of the PLS; or the training they were provided was inadequate.

108.    The CITY had a duty to ensure that RPD officers were properly trained in policing peaceful protests and other lawful demonstrations, to keep the participants safe and promote First Amendment expression.

109.    The CITY knew or should have known that its training was inadequate; that in the past, numerous RPD officers had seriously injured peaceful demonstrators; and that in the absence of proper training, RPD officers would use unreasonable and excessive force against peaceful protesters.

110.    The CITY breached his duty to keep Plaintiff and other demonstrators safe by, among other things, training RPD officers to police peaceful demonstrations in the same manner as they would police violent mobs.

111.    The CITY breached its duty to keep demonstrators safe by, among other things, training RPD officers to use "less lethal" weapons indiscriminately against protesters.

112.    Plaintiff's injuries on September 4-5, 2020 were a direct and proximate result of the CITY negligently training RPD officers in how to lawfully police peaceful protests and other First Amendment activities.

113.    Moreover, despite their use of extreme and excessive violence against protesters on September 2-6, 2020, the CITY was negligent in failing to supervise or discipline any of RPD officers related to any force used protesters on those nights prior to Plaintiff's injury. The CITY's negligence was the direct and proximate cause of Plaintiff's injuries.

114.    Defendant RPD officers' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

115.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**Negligence**

**(Against the Individual Defendants)**

116.    All preceding and subsequent paragraphs are incorporated by reference.

117.    The Defendant RPD officers, their agents, servants, employees, officers and deputies were negligent on September 4-5, 2020 using the "less lethal" military grade weapons and chemical weapons against Plaintiff, which was the direct and proximate cause of Plaintiff's injuries.

118.    The Defendant RPD officers had a duty to permit the protesters to engage in First Amendment Activities and to protect them from harm or physical violence.

119.    The Defendant RPD officers had a duty to not use force against any individual protester in the absence of individualized cause or legal justification for the use of force.

120.    The Defendant RPD officers breached that duty by firing "less lethal" munitions and chemical weapons into "groups" of protesters based on perceived "group conduct," without making any individualized determination that they were legally justified to use force against any individual in the perceived "group."

121.    The breach of that duty by the Defendant RPD officers was the direct and proximately cause of Plaintiff's serious injuries on September 4, 2020 described herein.

122.    Defendant RPD officers and Sheriff's Deputies' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

123.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

### EIGHTH CLAIM FOR RELIEF
**Respondeat Superior**
**(Against the City)**

124.    All preceding and subsequent paragraphs are incorporated by reference.

125.    The RPD officers, and other individuals who joined with them in their wrongful conduct, were, at all times relevant to this Count, were employees and agents of the Defendant CITY. Each of those defendants and persons was acting within the scope of his or her employment, and their acts and omissions, as alleged above, are therefore directly chargeable to the CITY under the doctrine of *respondeat superior.*

126.    As a result, Plaintiff sustained damages in an amount in excess of the jurisdictional limits of all the lower Courts of the State of New York.

**WHEREFORE** and in light of the foregoing, Plaintiff demands judgment on all claims for relief:

a.  Empanel a jury;

b.  Award compensatory and punitive damages;

c.  The Plaintiff demands the foregoing relief jointly and severally against all of the defendants in an amount in excess of the jurisdiction of all lower Courts, except that the punitive damages demands are, as a matter of law, not recoverable against a municipality and therefore are not made against the City;

d.  Award Plaintiff reasonable attorney's fees and costs, and interest pursuant to 42 U.S.C. § 1988; and

e.  Such other and further relief as the court may deem just and proper.

Dated: New York, New York
      September 6, 2021

Respectfully Submitted,

ROTH & ROTH, LLP.

Elliot Dolby Shields
Co-counsel for Plaintiffs
192 Lexington Avenue, Suite 802
New York, New York 10024
(212) 425-1020

Easton Thompson Kasperek Shiffrin LLP
Donald Thompson
Co-counsel for Plaintiffs
16 West Main Street, Suite 243
Rochester, New York 14614
Ph: (585) 423-8290

## ATTORNEY'S VERIFICATION

**ELLIOT DOLBY SHIELDS,** an attorney duly admitted to practice before the Courts of

the State of New York, affirms the following to be true under the penalties of perjury:

I am associated with Roth & Roth, LLP, attorneys for the Plaintiff, I have read the annexed

**VERIFIED COMPLAINT** and know the contents thereof, based on the files maintained in my

office, and the same are true to my knowledge, except those matters therein which are stated to be

alleged upon information and belief, and as to those matters I believe them to be true. My belief, as

to those matters therein not stated upon knowledge, is based upon facts, records, and other pertinent

information contained in my files. This verification is made by me and not the Plaintiff because I

maintain my office in a different county from where the Plaintiff resides.

DATED: New York, New York
       September 6, 2021

ELLIOT DOLBY SHIELDS